358 S.C. 460 (2004)
596 S.E.2d 51
PEOPLES FEDERAL SAVINGS AND LOAN ASSOCIATION OF SOUTH CAROLINA, Appellant/Respondent,
v.
RESOURCES PLANNING CORPORATION, Litchfield Plantation Company, Inc., Litchfield Plantation Association, Inc., and Louise P. Parsons a/k/a Louise Price Parsons, Respondents/Appellants, and
Lee R. Minton, Doris N. Beal, Joseph R. Bunn, II, Angela R. Bunn, Jeane M. Chapman, Jacqueline R. Coble, James Davies, Carol F. Davies, Cora N. Davis, Trustee, Thomas L. Davy, Jr., Jeanita S. Davy, Kevin W. Dickey, Christopher S. Dickey, William Talley Elliott, Jr., Emma T. Fairey, William F. Fairey, Hugh M. Farr, Ella Ray Farr, Anne C. Forrester, Donald *461 Gregg, Elizabeth L. Gregg, James H. Herbert, Elizabeth T. Herbert, Robert L. Jones, Trustee of Robert O. Jones, Retirement Trust, Robert D. Klemme, M. Virginia Klemme, Kathleen W. Lipscomb, Virginia W. Mackey, Winifred C. Moore, Ruby G. McManus, Adelaide S. Nichols, James E. Scott, II, Business Assets Trust, Jane Martin Smith, and James Harrison Whitner, IV, Trustee, Respondents.
No. 25812.
Supreme Court of South Carolina.
Heard October 22, 2003.
Decided April 26, 2004.
Rehearing Denied May 26, 2004.
*464 Michael W. Battle and Victoria T. Vaught, of Battle & Vaught, P.A., of Conway, and Douglas M. Muller of Moore & Van Allen, P.L.L.C., of Charleston, for appellant-respondent.
Howell V. Bellamy, Jr., and Douglas M. Zayicek, of Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, P.A., of Myrtle Beach, for Respondents-Appellants Resources Planning *465 Corporation, Litchfield Plantation Company, Inc., and Louise P. Parsons a/k/a Louise Price Parsons.
Robert W. Dibble, Jr., and Robert L. Widener, of McNair Law Firm, P.A., of Columbia, for Respondent-Appellant, Litchfield Plantation Association, Inc., and for Respondents Lee R. Minton, Doris N. Beal, Joseph R. Bunn, II, Angela R. Bunn, Jeane M. Chapman, Jacqueline R. Coble, James Davies, Carol F. Davies, Cora N. Davis, Trustee, Thomas L. Davy, Jr., Jeanita S. Davy, Kevin W. Dickey, Christopher S. Dickey, William Talley Elliott, Jr., Emma T. Fairey, William F. Fairey, Hugh M. Farr, Ella Ray Farr, Anne C. Forrester, Donald Gregg, Elizabeth L. Gregg, James H. Herbert, Elizabeth T. Herbert, Robert L. Jones, Trustee of Robert O. Jones Retirement Trust, Robert D. Klemme, M. Virginia Klemme, Kathleen W. Lipscomb, Virginia W. Mackey, Winifred C. Moore, Ruby G. McManus, Adelaide S. Nichols, James E. Scott, II, Business Assets Trust, Jane Martin Smith, and James Harrison Whitner, IV, Trustee.
PER CURIAM:
Appellant/Respondent Peoples Federal Savings and Loan Association of South Carolina (Peoples) filed this action seeking a declaration of its rights and interests as the successful bidder at the foreclosure sale of 30 acres of undeveloped property located within Litchfield Plantation. In addition, it alleged the defendants, Respondents/Appellants Resources Planning Corporation (RPC), Litchfield Plantation Company, Inc. (LPC), and Litchfield Plantation Association (LPA), conspired to injure the marketability of the purchased property through improper assessments and initiation fees. Peoples sought actual and punitive damages. The defendants filed various counterclaims.
After a merits hearing, the Special Referee determined Peoples acquired the foreclosed property subject to the same rights and limitations (including the payment of assessment fees) as any other purchaser of undeveloped Plantation property, but that RPC, LPC, and LPA had conspired to injure Peoples by destroying the marketability of its property and depreciating the value of its property through improper means. The referee awarded Peoples actual and punitive *466 damages as a result of the conspiracy and awarded RPC, LPC, and LPA contract damages. The referee set off the monetary awards, leaving a net award to Peoples of $161,816 actual damages on its conspiracy claim against RPC, LPC, and LPA, and $441,050 in punitive damages against RPC and LPC. The parties have filed cross-appeals. We affirm in part and reverse in part.

BACKGROUND
LPC was formed in the 1960s for the purpose of developing 600-acre Litchfield Plantation as a private residential development in Pawley's Island. In 1971, LPC recorded a Declaration of Restrictive Covenants to facilitate the development of Phase I of the project. The Covenants reserved to LPC significant rights as the developer, including rights to approve certain uses in the Plantation and exclusion from payment of any assessments by a property owners' association. The Plantation and the property to which the Covenants were applicable were described on a recorded plat which was incorporated by reference into the Covenants.
The Covenants mandate the formation of LPA which serves as the property owners' association for the Plantation. Each purchaser of property within Phase I is an automatic member of LPA. The Covenants require LPA to operate and maintain the common elements and impose upon LPA the duty to levy and collect assessments against certain property owners within Phase I to defray the cost. The Covenants specify: "[e]ach purchaser of any lot ... within Phase I, shall, by acceptance of a deed or other conveyance, be deemed to agree to pay [LPA] an annual assessment or charge to be fixed, established and collected from time to time as hereinafter provided." The only property exempt from assessments are properties owned or leased by LPC, LPA, and all property owned by their affiliates, subsidiaries, and paid employees.
The Covenants contain a specific provision making the Covenants and LPA's by-laws binding upon all owners within Phase I. In addition, the Covenants contain a provision making duly adopted amendments to the Covenants binding upon future owners of property subject to the amendment.
*467 In June 1971, LPC recorded master deeds for two condominium regimes in the Plantation. The sale of residential lots followed. Each deed to a condominium and to a residential lot was made subject to the Covenants. The purchasers became members of the LPA and became obligated to pay assessments levied by the LPA.
In the mid-1970s, LPC suffered severe financial hardship and underwent statutory reorganization. RPC became the "financial advisor" to LPC; RPC entered into a management contract with LPA. Donald Parsons is CEO of RPC; his children own all the stock in RPC. LPC's stock is held almost entirely by Parsons' wife, Louise Parsons. Donald Parsons serves on the board of directors for RPC, LPC, and LPA. Allan Kidston is an employee of RPC, a board member of LPA, and president of RPC, LPC, and LPA.
Prior to 1985, RPC acquired property in Phase I of the Plantation. Thereafter, Peoples loaned RPC $1,000,000. The loan was secured by personal guaranties, a mortgage from RPC on real estate within Phase I, and an accommodation mortgage from LPC on real estate within Phase I. In 1986, RPC negotiated a $400,000 loan from Peoples. The loan was secured by personal guaranties and an accommodation mortgage from LPC on real estate within Phase I. In 1984, the independent homeowners (those not affiliated with RPC or LPC), filed suit against LPC and LPA. A 1988 Settlement Agreement provided for various changes in and additions to the Covenants, including a ten year limitation on RPC's and LPC's voting control over LPA. Significantly, the agreement required RPC and LPC to designate at the time of sale the numbers of units within any area of undeveloped property in Phase I which was sold for development. The 1988 Agreement provided the developer (specifically defined as RPC, LPC, and their successors and assigns) would pay a "developers' assessment" of 20% of LPA's budget for ten years at the end of which the developers would make a final designation of total density on their undeveloped property and begin paying monthly assessments. During the ten year period, RPC and LPC were entitled to repayment if LPA had a budget surplus.
*468 Between 1989 and 1995, Peoples extended both loans on several occasions, however, Peoples' loans to RPC ultimately went into default and Peoples instituted an action to foreclose both mortgages. Peoples waived deficiency judgment on each loan. The Master-in-Equity entered an Amended Master's Report and an Amended Order of Sale pursuant to which he sold the real estate covered by the mortgages, approximately 30 undeveloped acres, at public sale on January 5, 1998. Peoples was the successful bidder; it purchased the property for $1,337,000. The master executed and delivered his deed to Peoples and the sale was confirmed by order on January 12, 1998. RPC, LPC, LPA, Donald Parsons, and Kidston appealed the master's order of foreclosure. The Court of Appeals affirmed. Peoples Fed. Sav. & Loan Assoc. of S.C. v. Resources Planning Corp., Op. No. 99-UP-118 (Ct.App.1999).
At or about the time of the foreclosure sale, RPC/LPC hired a commercial real estate appraiser to conduct a financial analysis of the property acquired by Peoples. The appraiser's report was generated based on 1) RPC/LPC's stated authority to control the development of the 30 acres and 2) monthly assessments on 120 units and an $1800 per unit initiation fee. The report details the expected annual costs which would be incurred by Peoples "until all legal questions have been resolved."
Sometime after the foreclosure sale, RPC and LPC designated a minimum of 120 assessable units and a maximum of 140 assessable units on the property acquired by Peoples. LPC notified LPA of the designation. On May 12, 1998, the LPA board, including Donald Parsons and Kidston, unanimously resolved to establish an initiation fee of $1800 per unit for all new members, retroactive to January 1, 1998. They further resolved to assess Peoples monthly assessments pro rata from January 6, 1998, on 120 units at the rate of $148.50 per unit. The following day, LPA informed Peoples of the $302,000 in charges.[1] Peoples claimed the assessments and initiation fees were unenforceable and refused to remit payment. *469 [2] Peoples instituted this litigation late in 1998. By the time of trial, Peoples had not sold or developed any part of the property.
In December 1998, RPC, LPC, and most of the other property owners, excluding Peoples, executed an agreement modifying the 1988 Agreement. The modification extended the 1998 deadline for ending developer control of LPA for three years or until the end of litigation with Peoples. While the extension was in effect, RPC and LPC were entitled to repayment of their loans to LPA if LPA generated a budget surplus.[3]
One month before trial, LPA issued a statement to Peoples requesting payment of $4,012,928 representing monthly homeowner's assessments, initiation fees of $216,000, late charges, and interest. Two weeks later, LPA issued a revised statement, deleting the initiation fees and late charges thereon. The revised statement reflected assessments and late charges of $2,254,628. Five days prior to trial in May 2000, a second revised statement reduced the assessments and late charges to $614,256.
Since 1985, LPC has not sold any new lots or condominiums, but it has exercised the right of first refusal provided in the 1971 Covenants to reacquire many of the lots and condominiums previously sold. By the time of trial in the current case (May 2000), LPC had sold 53 condominium or single family residential lots even though the Plantation had the capacity to develop 800 units. Less than thirty of the sold properties were purchased by individuals not affiliated with RPC, LPC, or Louise Parsons.
In his final order, the referee concluded, as a purchaser of 30 acres of undeveloped property in Phase I of the Plantation, Peoples was subject to assessments imposed by LPA pursuant to the 1988 Amendments. The referee concluded, however, the 120-unit designation was untimely, improper, or illegal. Accordingly, the referee imposed a 2-unit designation on each *470 of the 30 acres purchased by Peoples based on the minimum designation established by the 1988 Amendments.

ISSUES
I. Did the referee err by finding evidence of a conspiracy?
II. Did the referee impose improper awards of actual and punitive damages?
III. Did the referee err by denying LPA's Rule 12(b)(6), SCRCP, motion to dismiss?
IV. Did the referee err by ruling on the validity of the right of first refusal provision in the Covenants?
V. Did the referee err by determining Peoples did not become a co-developer with RPC/LPC when it acquired the Plantation property at the foreclosure sale?

I. Evidence of Conspiracy
RPC, LPC, and Louise P. Parsons assert the referee erred by finding the existence of a conspiracy. More specifically, they claim because LPC was contractually required to designate a number of units under the terms of the 1988 Amendments to the Covenants, there is no evidence the defendants intended to harm Peoples. We disagree.
A civil conspiracy is a combination of two or more parties joined for the purpose of injuring the plaintiff and thereby causing special damage. Future Group, II v. Nationsbank, 324 S.C. 89, 478 S.E.2d 45 (1996). Conspiracy may be inferred from the very nature of the acts done, the relationship of the parties, the interests of the alleged conspirators, and other circumstances. Island Car Wash, Inc. v. Norris, 292 S.C. 595, 358 S.E.2d 150 (Ct.App.1987). "Civil conspiracy is an act which is by its very nature covert and clandestine and usually not susceptible of proof by direct evidence...." Id. at 601, 358 S.E.2d at 153. An action for civil conspiracy is an action at law; the trial judge's findings will be upheld on appeal unless they are without evidentiary support. Gynecology Clinic v. Cloer, 334 S.C. 555, 514 S.E.2d 592 (1999).
In relevant part, the 1988 Amendments provide: Sale of Undeveloped Parcel: In the event the Developer sells an undeveloped parcel of land for purposes of development *471 (an "Undeveloped Parcel") to a party not related to the Developer (the "Unrelated Builder") for development into Units, the Developer shall designate a maximum and a minimum number of Units to be available and of votes to be assigned to that particular Undeveloped Parcel at the time of sale. In no event shall the number of assessments to be paid by the Unrelated Builder be less than two times the number of acres of buildable high ground acres in the Undeveloped Parcel.
We disagree with RPC/LPC's premise that LPC was contractually obligated to designate a number of units under the terms of the 1988 Amendments. Instead, the 1988 Amendments specifically required RPC/LPC to designate the number of assessable units on undeveloped property "at the time of sale." The 1988 Amendments did not authorize RPC/LPC to designate a number of units for assessment purposes four months after the sale of undeveloped property.
In any event, the referee found the following facts constituted direct and/or circumstantial evidence of RPC and LPC's intent and motive to harm Peoples by imposing the 120 unit designation: 1) RPC and LPC unsuccessfully defended the foreclosure suit; 2) RPC and LPC were unable to post bond to stay the foreclosure sale; 3) at the time of the foreclosure, RPC hired a real estate appraiser who detailed Peoples' expected losses over a several year period using the proposed unit designation and initiation fee if Peoples refused to submit to RPC/LPC's control; 4) RPC and LPC proposed a density designation, but concealed the designation from Peoples for more than four months after the foreclosure sale; 5) the designation created an opportunity for RPC and LPC to buy the distressed property back from Peoples for a fraction of its original cost; 6) RPC and LPC stood to directly benefit from the 120-unit assessment as the two were required to make up LPA's budgetary shortfall; and 7) RPC/LPC notified Peoples of the $302,000 charge during a settlement conference concerning two other pending actions between Peoples and RPC/LPC. The record is replete with evidence establishing RPC/LPC's motive and intent to injure Peoples. Accordingly, the Court is required to affirm the referee's findings of fact. Id.

*472 II. Damages

A. Actual Damages
The referee awarded Peoples damages based on his determination the "claimed assessments depreciated the present value of Peoples' property and created a reasonable probability of litigation which destroyed its marketability." The referee awarded Peoples $749,767 in actual damages based on two categories of damages: 1) $454,959 representing the diminution in present value of the property and 2) $294,808 representing Peoples' holding costs for the 30 acres during the period of the conspiracy.
In a conspiracy action, what is required is proof of the fact of damages, not certainty of amount. Charles v. Texas Co., 199 S.C. 156, 18 S.E.2d 719 (1942). "The elements which go to make up such damages must depend on the nature of the act and the injury." Id. S.C. at 174, S.E.2d at 726 internal citation omitted.

1. Diminution in Value
LPA contends the referee erred by awarding actual damages based on the diminution in market value of Peoples' property. Relying on Yadkin Brick Co., Inc. v. Materials Recovery Co., 339 S.C. 640, 529 S.E.2d 764 (Ct.App.2000), and opinions from Texas and Ohio, LPA asserts damages for the temporary, non-physical injury to property is limited to the loss of rental value during the time of the temporary injury. We disagree.
In Yadkin Brick Co., Inc. v. Materials Recovery Co. id., the Court of Appeals held diminution in market value is an appropriate measure of damages where there is injury of a permanent nature to real property. Where the injury is temporary, the landowner can recover the depreciation in the rental or usable value of the property caused by the injury.
Yadkin Brick, id., concerns the appropriate measure of damages where there is physical injury to real property. Here, Peoples suffered economic injury. Accordingly, Yadkin Brick is inapplicable.
Seelbach v. Clubb, 7 S.W.3d 749 (1999 Ct.App. Tex.), and Hall v. Robbins, 790 S.W.2d 417 (1990 Ct.App. Tex.), involved *473 the temporary loss of use of land due to blocked access to the property. In both cases, the Texas Court of Appeals held the rental value of the land was an appropriate measure of damages under the circumstances. The Texas courts noted the lease value or rental value of the land was not the only appropriate measure of damages which can be awarded for the temporary loss of use of land. Relying on the earlier Texas decision, in Henderson v. Spring Run Allotment, 99 Ohio App.3d 633, 651 N.E.2d 489, 497 (1994), the Ohio court held lost profits were the appropriate measure of damage "under [the] circumstances" where plaintiffs discharged untreated sewage prevented defendant from selling the residential lots.
The referee did not abuse his discretion by fashioning damages on the diminution in value of Peoples' property during the pendency of the assessments, initiation fees, and ensuing litigation. The referee's damage award recognizes the temporary loss in value of Peoples' 30 acres as a result of the retroactive imposition of 120 units worth of assessments and initiation fees months after its purchase of the property. The referee's award attempts to restore Peoples to the "benefit of the bargain" at the time of its purchase in January 1998. Considering the nature of the conspiracy and its resulting injury to Peoples, the referee's attempt to base the actual damage award on Peoples' special injury is appropriate. Charles v. Texas Co., supra, This result is in accord with the Texas and Ohio cases referenced by LPA which state the appropriate measure of damages should be determined by the circumstances.

2. Martin Letter
LPA contends the referee erred by using the "Martin Letter" to extrapolate the diminution in value of Peoples' property because 1) the letter was inadmissible as a part of settlement negotiations and 2) it did not address diminution in value. We disagree.
Over LPA's objection, the referee admitted the June 4, 1998 letter prepared by certified appraiser Robert S. Martin. As stated in the letter, RPC hired Martin to prepare a financial analysis of Peoples' property as of January 1, 1996, and for the next three years. The report is an appraisal of the value of *474 Peoples' investment considering assessments and initiation fees for 120 units and RPC's right to control and veto the construction on the property. It is undisputed the Martin report was requested by RPC to assist it in settlement negotiations with Peoples during the appeal of the foreclosure action and lender liability suit.
Rule 408, SCRE, provides that evidence of offers or acceptances of settlement "is not admissible to prove liability for or invalidity of the claim or its amount."
While the Martin letter provides an estimate of value of Peoples' property, the Martin letter was not evidence of an offer of settlement. Instead, the report was produced to assist RPC in its own evaluation of settlement of the foreclosure and lender liability suits. It did not constitute evidence of an offer of settlement.
Moreover, the referee adopted the model, not the actual data, used by Martin to determine the value of Peoples' property. Using Martin's model, the referee projected the value of Peoples' property based on assessments and initiation fees of 120 and 60 units. From these results, the referee extrapolated the diminution in value of Peoples' property. The admission of the letter was not an abuse of discretion. Gamble v. Int'l Paper Realty Corp., 323 S.C. 367, 474 S.E.2d 438 (1996) (admission or exclusion of evidence within sound discretion of trial court and, absent clear abuse, will not be disturbed on appeal).

3. Cost of Carry/Holding Costs
LPA argues the referee erred by awarding Peoples holding costs. Alternatively, it asserts the referee allowed Peoples a double recovery because the costs of carry were included in the discount rate.
Holding costs are expenses such as insurance or taxes associated with "carrying" property over a period of time. Peoples Fed. Sav. and Loan Ass'n v. Myrtle Beach Retirement Group, Inc., 302 S.C. 223, 394 S.E.2d 849 (Ct.App.1990). We conclude holding costs are appropriate. The referee did not abuse his discretion by awarding these costs to Peoples. Gynecology Clinic v. Cloer, supra.
*475 Nevertheless, the award appears to provide Peoples with double recovery of its holding costs. As noted above, in order to determine Peoples' actual damages, the referee adopted the model provided in the June 4, 1998 report of RPC's appraiser. The appraiser's report includes the carrying costs associated with Peoples' retaining the 30 acres (i.e., the 120 unit monthly assessment, the per unit initiation fee, property taxes, and insurance) while the parties debated permissible development of the property. The model applies a 12% discount rate, representing the market return expected by a residential real estate developer, to determine the present value of Peoples' property. Since the model already includes Peoples' holding costs, permitting Peoples to earn an additional 6.3% cost of money for its costs of carry, the referee permitted a double recovery.

B. Punitive Damages
LPA argues it was subject to RPC and LPC's control (by voting control, the Covenants, and 1988 Amendments), and therefore, there was no evidence it acted willfully. Accordingly, LPA asserts the award of punitive damages must be reversed. We disagree.
There is clear and convincing evidence LPA acted willfully in imposing the 120 unit assessments and initiation fee on Peoples.[4] Although governed by the 1971 Covenants and 1988 Assessments and subject to the voting control of LPC, LPA, a non-profit corporation, was not authorized to act improperly, much less illegally, as found by the referee. LPA was not entitled to assess the 120 unit fee even though so instructed by LPC. Furthermore, LPA, on its own initiative, imposed the retroactive initiation fee. LPA's imposition of the 120 lot assessment and initiation fees constitutes clear and convincing evidence which supports a punitive damages award.

III. Rule 12(b)(6), SCRCP

LPA argues the referee erred by denying its Rule 12(b)(6), SCRCP, motion to dismiss Peoples' complaint for failure to state a cause of action for conspiracy. LPA asserts Peoples' *476 conspiracy claim is simply a restatement of its breach of fiduciary duty claim and fails to allege any special damages resulting from the conspiracy. We disagree.
A plaintiff cannot recover damages for a particular act or wrong and likewise recover on a conspiracy to do the act or wrong. See Todd v. South Carolina Farm, Bureau Mut. Ins. Co., 276 S.C. 284, 278 S.E.2d 607 (1981), rev'd on other grds. 287 S.C. 190, 336 S.E.2d 472 (1985); Vaught v. Waites, 300 S.C. 201, 387 S.E.2d 91 (Ct.App.1989); See F. Hubbard and R. Felix, The South Carolina Law of Torts 2d ed. (1997) (authors suggest Todd v. South Carolina Farm Bureau Mut. Ins. Co., supra, limited to proposition that plaintiff can only recover damages once and must elect remedy).
The damages alleged in Peoples' breach of fiduciary duty and conspiracy claims are similar. However, since the referee directed the verdict in favor of LPA on Peoples' breach of fiduciary duty claim, LPA is not twice subject to payment for damages for the same act. There is no error.

IV. Rule against Perpetuities

RPC, LPC, and Louise P. Parsons argue the referee erred by ruling the right of first refusal in the 1971 Covenants[5] was void and unenforceable as violative of the rule against perpetuities (RAP).[6] They assert there is no justiciable controversy surrounding the right of first refusal provision because Peoples *477 has not received a bona fide offer to purchase its property. We agree.
"A threshold inquiry for any court is a determination of justiciability, i.e., whether the litigation presents an active case or controversy." Lennon v. S.C. Coastal Council, 330 S.C. 414, 415, 498 S.E.2d 906, 906 (Ct.App.1998). "A justiciable controversy is a real and substantial controversy which is ripe and appropriate for judicial determination, as distinguished from a contingent, hypothetical or abstract dispute." Pee Dee Elec. Coop. Inc., v. Carolina Power & Light Co., 279 S.C. 64, 66, 301 S.E.2d 761, 762 (1983). A declaratory judgment action must involve an actual, justiciable controversy. Southern Bank & Trust Co. v. Harrison Sales Co., 285 S.C. 50, 328 S.E.2d 66 (1985).
In Webb v. Reames, 326 S.C. 444, 485 S.E.2d 384 (Ct.App. 1997), the Court of Appeals held a case or controversy regarding the validity of a pre-emptive right does not accrue until the right has been asserted. We concur with this ruling. Absent a pending sale or offer for sale, or purchase or offer to purchase, or the presence of a third party challenging right of first refusal, there is no justiciable controversy. See Parker v. Weed, 220 Mont. 49, 713 P.2d 535 (1986).
Because Peoples does not have a pending offer for the purchase of its property, there is currently no justiciable controversy concerning the validity of the preemptive right provision in the Covenants. Accordingly, the referee erred by ruling on the enforceability of the right of first refusal provision. But see Webb v. Reames, supra (where preemptive right might not vest within a life in being at the time of creation of right or until later than 21 years thereafter, interest violates RAP and is, therefore, void); see also Estate of Johnson v. Carr, 286 Ark. 369, 691 S.W.2d 161 (1985) (where preemptive right is of unlimited duration, the provision is considered void as violative of RAP); Atchison v. City of Englewood, 170 Colo. 295, 463 P.2d 297 (1969) (same); Peele v. Wilson County Bd. of Ed., 56 N.C.App. 555, 289 S.E.2d 890 (1982) (same).

V. Acquisition of Developers' Rights

Peoples asserts the referee erred by ruling it did not acquire RPC's and LPC's developers' rights through succession. *478 Peoples relies principally upon Bd. of Managers of Medinah on the Lake Homeowners Ass'n v. Bank of Ravenswood, 295 Ill.App.3d 131, 229 Ill.Dec. 629, 692 N.E.2d 402 (1998), as support for its assertion that, by acquiring the undeveloped property through foreclosure, it became the developer as a successor to RPC or LPC.
"`[S]uccessor' is a term of art.' It may mean ... succeeding to a place, or a right, or an interest or a power, official, or otherwise ... The word `successor' has a twofold meaning: It may be used in the sense of one entitled to succeed as well as in the sense of one who has in fact succeeded." Battery Homeowners Ass'n v. Lincoln Financial Resources, Inc., 309 S.C. 247, 250, 422 S.E.2d 93, 95 (1992) (internal citations omitted) (holding where declaratory covenants permitted named homeowners association "and it successors" to charge regime fee, newly-established property owners' association was properly considered successor entitled to charge regime fee).
In Bank of Ravenswood, id., A.P. Ross Enterprises (A.P.Ross), as beneficiary of a trust, proposed to develop a residential community with a certain number of units on each of three lots. A fourth lot was set aside for the community's common area. Heritage Bank held title to the lots as trustee and recorded restrictive covenants. The declaration defined "developer" as A.P. Ross "and its successors and assigns" and the "declarant" as Heritage Bank as trustee "and its successors and assigns."
To fund the development, Heritage Bank as trustee executed and delivered a note to Exchange Bank. A.P. Ross guaranteed the note and signed a collateral agreement assigning 100% beneficial interest in the Heritage Bank trust to Exchange Bank upon default. After developing one lot, Heritage Bank and A.P. Ross became insolvent and the property was purchased by Exchange Bank through a foreclosure proceeding. Ultimately, another purchaser, Ravenswood Bank, acquired the three undeveloped lots and held title as trustee.
The homeowners association filed suit against Ravenswood Bank to recover a portion of the operating expenses for maintenance of the common areas. Ravenswood Bank filed a third party complaint against the established condominium.
*479 The trial judge ruled Ravenswood Bank was not the declarant or the developer and, therefore, had no right to develop or erect any structure on the property.
The Illinois Appellate Court held a purchaser of real property through a foreclosure sale can develop property as a successor of a declarant. While noting developers' rights are generally personal in nature, the Illinois Appellate Court held the powers reserved by a developer "and its successors and assigns" in restrictive covenants can, in appropriate circumstances, be exercised by the developer's successors. In making its decision, the court expressed concern that commercial lenders may limit the extension of credit or increase its costs if precluded from acquiring developers' rights upon default.
We find Bank of Ravenswood persuasive and conclude several factors presented by this case convince us that Peoples should be deemed a successor/co-developer of RPC/ LPC. First, we recognize that in both the Covenants and 1988 Amendments, RPC and LPC specifically contemplated the possibility of successorship. See Covenants definition of LPC includes "its successors;" 1988 Amendments define "developer" as LPC, RPC "and their respective successors." Second, we note Peoples could not have reasonably anticipated the imposition of an extraordinarily large assessment, much less an initiation fee, four months after its purchase of the Plantation property through the foreclosure sale. Third, as demonstrated by RPC, LPC, and LPA's actions towards Peoples, we perceive a deep-seated animosity between the parties which may affect Peoples' ability to develop or otherwise dispose of its Plantation property. Fourth, like the Bank of Ravenswood court, we are concerned that commercial lenders may hesitate to provide loans at beneficial rates if they are precluded from acquiring developers' rights when the defaulting party acts less than honestly. Accordingly, under the unusual circumstances presented, we find Peoples acquired the position of co-developer through its purchase of the thirty acres at the foreclosure proceeding.[7]

*480 CONCLUSION

In conclusion, the referee's order is affirmed in part and reversed in part and this matter is hereby remanded to the referee to modify the damages award to reflect the rulings in this opinion. Finally, we note that as co-developers, RPC/ LPC and Peoples are required to abide by the 1971 Covenants, as amended. As co-developers, the parties must "develop and improve in accordance with an harmonious plan for the design and relative location [of single-family dwellings and/or condominium apartments], so as to create a community to be known as `Litchfield Plantation' providing the greatest possible degree of beauty and amenity for all the property owners and inhabitants thereof."
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.
TOAL, C.J., MOORE, WALLER, BURNETT and PLEICONES, JJ., concur.
NOTES
[1] Kidston delivered the letter to Peoples at a conference during which the parties discussed settling the appeal of the foreclosure action and a lender liability suit instituted by RPC, LPC, Donald Parsons, and Kidston against Peoples after the foreclosure.
[2] Peoples was the only property owner subject to this initiation fee.
[3] At some point, LPA owed LPC nearly $2,000,000 for funding budget deficits. In turn, LPC owed RPC $100 million in mortgage debt.
[4] The plaintiff has the burden of proving punitive damages by clear and convincing evidence. S.C.Code Ann. § 15-33-135 (Supp.2002).
[5] The Covenants provide:

Prior to acceptance of any offer for the purchase of any property (including improvements, if any) the owner thereof shall first offer said property for sale to the Corporation for the same price at which the higher bona fide offer has been made for such property, and the said Corporation shall have thirty (30) days within which to exercise its option to purchase said property at such price; should the Corporation fail or refuse, within thirty (30) days after receipt of written notice of the price and terms of the offer, to exercise its option to purchase said property, then the owner thereof shall have the right to sell said property subject, however, to all covenants, restrictions and limitations contained therein.
[6] RAP provides: "A non-vested property interest is invalid unless: (I) when the interest is created, it is certain to vest or terminate no later than twenty-one years after the death of an individual then alive." S.C.Code Ann. § 27-6-20 (1991).
[7] Because Peoples is a co-developer with RPC/LPC, and, therefore, entitled to the developer's exemption from the homeowners' assessment, RPC/LPC and LPA are not entitled to costs and attorneys' fees incurred by their efforts to enforce payment of the homeowners' assessment.